TREVOR N. MCFADDEN, U.S.D.J.
Corinthian Colleges, Inc., once operated over a hundred for-profit college campuses across the country. Multiple state and federal investigations revealed that Corinthian defrauded students by falsifying its post-graduation job placement data. Facing millions of dollars in fines and allegations of deceptive marketing, Corinthian filed for bankruptcy and announced the closure of its schools in 2015.
*10 The Department of Education oversees federal loan programs that provided financial aid to thousands of Corinthian enrollees. Student borrowers may assert as a defense against repaying their loans any conduct by a school that would give rise to a cause of action against the school under applicable state law. See 34 C.F.R. § 685.206(c). In the wake of Corinthian's collapse, more than 100,000 borrowers have raised this defense. Defs.' Mem. in Supp. of Mot. to Dismiss 9, ECF No. 26-1 ("Defs.' Mem."). To apply for relief, the students must attest that they were enrolled in a Corinthian-operated program that misrepresented job placement rates and that they relied on this misrepresentation when deciding to enroll. Id. at 10. Borrowers who have not submitted an attestation remain subject to the Department's debt collection efforts, including wage garnishment orders and tax refund seizures. Am. Compl. 26.
Massachusetts, Illinois, and New York (collectively, the "States") challenge the Department's collection activity. They contend that the debts incurred by former Corinthian students are not legally enforceable and that subjecting these borrowers to wage garnishment and refund seizures is arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). Am. Compl. 30. They seek declaratory and related relief on behalf of the students who attended Corinthian schools in the three states.
The Defendants moved to dismiss the case, arguing that the States lack standing to sue, that they fail to sufficiently allege "agency action" as required by the APA, and that the Department's collection activity is lawful. See Defs.' Mem. at 14-32. Because the Court finds that the States have not established standing to bring this action, it will grant the Defendants' motion.
I.
Title IV of the Higher Education Act allows college students to apply for and receive loans from the federal government to pay for educational expenses. See 20 U.S.C. § 1087a et seq. While these loans must generally be repaid, the Department has the authority to specify certain "acts or omissions of an institution of higher education [that] a borrower may assert as a defense to repayment of a loan made under [the Act]." Id. at § 1087e(h). The Department's regulations allow borrowers to raise as a defense "any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c).
Federal law requires the Department to "try to collect" any "claim of the United States Government for money or property arising out of the activities of, or referred to, the agency." 31 U.S.C. § 3711(a)(1). Accordingly, the Department refers "legally enforceable nontax debt that is over 120 days delinquent" to the Treasury Department. 31 U.S.C. § 3716(c)(6)(A). Through administrative offsets, the Treasury may withhold tax refunds and other monies payable to a borrower to recover the debt. See 31 U.S.C. § 3701(a)(1). The Department of Education also may garnish wages when attempting to collect claims. 31 U.S.C. § 3720D(a). A borrower may raise the conduct of a school as a defense in response to such wage garnishments, tax refund seizures, and other offsets. 34 C.F.R. § 685.206(c). But until this defense is asserted and the Department adjudicates the borrower's application, collection activities continue. See Defs.' Mem. 2.
At issue in this case are the delinquent student loan debts of borrowers who attended Corinthian's colleges. Between 2010 and 2014, at least 71 Corinthian campuses *11 across the country fraudulently misrepresented job placement rates for many of their programs of study. Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss 6, ECF No. 27 ("Pls.' Mem."). In response, the Department simplified the process for asserting defenses to loan repayment. Defs.' Mem. at 9. It created "attestation forms" requiring student borrowers to provide the name and dates of the program they attended, the degree they sought, and a certification that they enrolled based on the school's advertising materials or similar representations. Id. at 10. Once borrowers submit this form, their loans are "placed in forbearance or stopped collection until their claim is resolved." Id. at 11.
But this is not enough, according to the States. They seek to prevent the Department from engaging in further debt collection against all potentially defrauded borrowers, not just those who file attestation forms. Pls.' Mem. 9. They argue that the debts incurred by former Corinthian students are not legally enforceable because of the company's fraudulent misrepresentations, and that the Department knows these debts are unenforceable. Pls.' Mem. at 26. Thus, by submitting the debts to the Treasury for collection upon delinquency, the Department is acting arbitrarily and capriciously in violation of the APA. Id.
The States claim standing to bring this claim on three grounds. First, they allege harm to their "sovereign interest in the correct interpretation of their state laws as incorporated into federal law." Id. at 2. The Department's debt collection efforts rest on a "misinterpretation of state law regarding the enforceability of the debts in question," and the States have an interest in the proper interpretation and enforcement of their legal codes. Id. Second, the States suggest they have a quasi-sovereign interest in the economic well-being of their residents that entitles them to sue the Department as parens patriae .[1] Id. Third, they argue that the Department's "unlawful collection activities" have directly harmed their proprietary interests. Id. at 21. But for this debt collection "individuals would have additional assets" and would also be able to "attend the States' community colleges and universities." Id. at 21-23. The Department's conduct therefore caused the States to "pay increased government benefits" and receive "reduced revenues." Id. at 21-22.
The Defendants disagree. They argue that the Department's conduct does not interfere with the States' exercise of their sovereign powers, that a state cannot assert standing as parens patriae against the federal government, and that the alleged direct injury to the States' proprietary interests is not attributable to the Department's actions. See Defs.' Mem. at 14-20. Thus, because the States lack standing, the Defendants contend that the Court does not have subject matter jurisdiction over their claims and seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1). Id. at 13. They also seek dismissal under Rule 12(b)(6), as they believe that the Department's debt collection efforts are lawful and not subject to challenge under the APA. Id. at 21-25.
II.
Article III of the U.S. Constitution limits this Court's jurisdiction to "actual cases or controversies."
*12 Clapper v. Amnesty Int'l USA , 568 U.S. 398, 408, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies," and the "concept of standing is part of this limitation." Simon v. E. Kentucky Welfare Rights Org. , 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (citation omitted). To establish their standing, the States must allege an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper , 568 U.S. at 409, 133 S.Ct. 1138.
The parties invoking the Court's jurisdiction bear the burden of establishing standing. Susan B. Anthony List v. Driehaus , 573 U.S. 149, 134 S.Ct. 2334, 2342, 189 L.Ed.2d 246 (2014). When facing a motion to dismiss under Rule 12(b)(1), they "must clearly allege facts demonstrating each element." Spokeo, Inc. v. Robins , --- U.S. ----, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (cleaned up). The Court presumes that it "lack[s] jurisdiction unless the contrary appears affirmatively from the record." Renne v. Geary , 501 U.S. 312, 315, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991). The Court will "draw all reasonable inferences from [the States'] allegations in [their] favor," but will not "accept inferences that are unsupported by the facts," "assume the truth of legal conclusions," or credit "threadbare recitals of the elements of standing." Arpaio v. Obama , 797 F.3d 11, 19 (D.C. Cir. 2015).
Separately, litigants may move to dismiss a complaint for a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A valid complaint must contain factual allegations that, if true, "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly , 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).
III.
The States lack standing to bring this suit. Though they have a cognizable sovereign interest in enforcing their laws, the States allege no harm to that interest traceable to the Department's conduct. Their parens patriae standing theory also fails, as the States cannot sue the federal government when both are acting in furtherance of a shared quasi-sovereign interest in protecting citizens' economic well-being. Finally, the States have not plead harm to their proprietary interests with sufficient concreteness and particularity.
A.
The "power to create and enforce a legal code" is a sovereign interest, and impediments to sovereign interests can give states standing to sue in federal court. Alfred L. Snapp & Son , 458 U.S. at 601-02, 102 S.Ct. 3260. But not always. The identity of the party being sued is a relevant factor in determining a state's standing as a sovereign. The "presence of a state defendant," for instance, "provides added impetus to recognize standing to sue wherever the interests of the state are substantially implicated" by the defendant's conduct. Pennsylvania v. Kleppe , 533 F.2d 668, 676 (D.C. Cir. 1976). By contrast, "the mere existence of a state law ... does not license a state to mount a judicial challenge to any federal statute with which the state law assertedly conflicts." Virginia ex rel. Cuccinelli v. Sebelius , 656 F.3d 253, 269 (4th Cir. 2011). Rather, to sufficiently allege standing against the federal government, a state must show that a federal law or its application "interferes with [the] state's exercise of its sovereign power to create and enforce a legal code." Id. (emphasis in original).
*13 Some statutes governing the actions of federal agencies "adopt and incorporate state law on issues of common concern." Nuesse v. Camp , 385 F.2d 694, 700 (D.C. Cir. 1967). This "admixture of national and state policies" means that a "state official directly concerned in effectuating the state policy has an 'interest' in a legal controversy involving the [agency] which concerns the nature and protection of the state policy." Id. Thus, when a state law is explicitly incorporated into a federal statute, Congress intends it to be enforced, and a state may intervene to ensure that the agency tasked with implementing the statute does not violate the state law in question. Id.
Consider an example. In Nuesse , Wisconsin's Commissioner of Banks sued the U.S. Comptroller of the Currency. The Comptroller "was about to issue a certificate of approval" for a national bank to open a branch in Wisconsin. Nuesse , 385 F.2d at 698. The source of the Comptroller's authority was the National Bank Act, which allowed national banks to open a branch in a state only "if such establishment and operation are at the time expressly authorized to state banks, by the law of the State in question." Id. The relevant Wisconsin law generally prohibited state banks from branching. Id. The Nuesse court found that Congress wrote this provision to ensure the "protection of the competitive equality of state [and national] banks." Id. at 701. It therefore concluded that Wisconsin had "an adequate interest" in ensuring that the branch was not opened in direct violation of state law and permitted the Commissioner to intervene in the case. Id.
The States argue that they have a similar interest in the interpretation and implementation of the Department's borrower defense regulations. Pls.' Mem. at 12. True, "the federal defense to loan repayment standard explicitly incorporates state law."[2] Id. When adjudicating borrower defense applications, the Department "must make determinations regarding state law, such as whether an individualized showing of reliance [on fraudulent representations] is required." Pls.' Mem. at 13.
But here, unlike in Nuesse , the States fail to allege any federal actions that impede the enforcement of their laws. The States claim that the Department "apparently takes the position that borrowers must show reliance" to be entitled to relief. Id. Because their laws impose no such requirement, the States suggest, the Department's approach "clearly conflicts with existing precedent in each of the States." Id. They cite as evidence an earlier filing by the Defendants, which notes that "an individually-signed (successful) application for relief ... provides information critical to the Secretary's determination [including] ... importantly, the borrower's attestation that s/he actually relied on the school's misrepresentation in deciding to enroll." Defs.' Mem. of P. & A. in Supp. of Mot. to Dismiss 35-36, ECF No. 17-1. This *14 statement, however, does not establish that the Department denies borrowers relief based on a failure to assert reliance. Instead, it suggests merely that the Department considers reliance one of several factors in making its ultimate determination.
Moreover, the Department may sometimes require a showing of reliance without violating state law. For example, Corinthian defrauded students who attended the company's Heald College campuses in California. The Department found that Heald violated California law, "which does require reliance." Defs.' Reply in Supp. of Mot. to Dismiss 9 n.2, ECF No. 28 ("Defs.' Reply"). Thus, requiring these students to attest that they relied on Corinthian's false or misleading claims does not violate state law. The States offer no facts suggesting that the Department's reliance requirement has been used to deny applications for relief submitted by borrowers from Massachusetts, Illinois, or New York.
The States also claim that "the Department's interpretation of state law, which concludes that the debts are legally enforceable, is in direct conflict with [an] order of the Massachusetts Superior Court finding a violation of Massachusetts law with respect to" each former Corinthian student in the Commonwealth. Pls.' Mem. 14. But the legal enforceability of the student loans is a question of federal, not state, law. Congress requires the Department to "notify the Secretary of the Treasury" of any "legally enforceable nontax debt [the Department is owed] that is over 120 days delinquent." 31 U.S.C. § 3716(c)(6)(A). Treasury regulations state that "[l]egally enforceable refers to a characteristic of a debt and means that there has been a final agency determination that the debt, in the amount stated, is due, and there are no legal bars to collection by offset." 31 C.F.R. § 285.5(b). Neither Treasury regulations nor the Higher Education Act provide that a student debt owed to the Department is per se legally unenforceable because of the conduct of a third party, or because of any state law.
Two distinct questions are at issue. The first concerns the legal enforceability of the debts that student borrowers owe the Department. The States have not shown that their laws apply when the Department certifies those debts as enforceable for the purposes of complying with its obligations under federal law. The second concerns defenses against enforcement that students may raise. The Department's borrower defense adjudication does implicate state law. But the States have not shown that their laws have been misapplied during this adjudication. Thus, they have not identified any agency conduct encumbering their capacity to enforce state laws and have therefore failed to establish standing based on harm to their sovereign interests.
B.
The States' efforts to establish parens patriae standing fare no better. To sue as parens patriae , they "must assert an injury to what has been characterized as a 'quasi-sovereign' interest, which is a judicial construct that does not lend itself to a simple or exact definition." Alfred L. Snapp & Son , 458 U.S. at 601, 102 S.Ct. 3260. Governments have a quasi-sovereign interest in the "health and well-being-both physical and economic-of [their] residents in general." Id. at 607, 102 S.Ct. 3260. Here, the States "assert their quasi-sovereign interest in protecting the economic well-being of their citizens who were defrauded by Corinthian." Pls.' Mem. at 18. However, because it shares this interest, the federal government, rather than the States, wields the relevant parens patriae power.
*15 The D.C. Circuit has said that a state "does not have standing as parens patriae to bring an action against the Federal Government." Maryland People's Counsel v. Fed. Energy Regulatory Comm'n , 760 F.2d 318, 320 (D.C. Cir. 1985) (quoting Alfred L. Snapp & Son , 458 U.S. at 610 n.16, 102 S.Ct. 3260 ). An individual's "dual citizenship in both state and nation, with separate rights and obligations arising from each, suggests that both units of government act as parens patriae within their separate spheres of activity." Kleppe , 533 F.2d at 676-77. The "general supremacy of federal law" means that "the federal parens patriae power should not, as a rule, be subject to the intervention of states seeking to represent the same interest of the same citizens." Id. at 677. As the Supreme Court "has long recognized, only the United States, and not the states, may represent its citizens and ensure their protection under federal law in federal matters." Ctr. for Biological Diversity v. Dep't of Interior , 563 F.3d 466, 477 (D.C. Cir. 2009) (citing Massachusetts v. Mellon , 262 U.S. 447, 485-86, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) ).
The States suggest, however, that "[a]ny argument that Mellon or Snapp categorically bars parens patriae actions against the federal government is ... undermined by the Court's more recent decision in Massachusetts v. EPA ." Pls.' Mem. at 16 (discussing Massachusetts v. EPA , 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) ). While they may not sue the federal government to shield their citizens from the operation of federal law, they contend, the States may do so to "enforce the rights guaranteed by federal law." Id. at 14-16. In support of this position, they cite recent cases from other jurisdictions. See, e.g. , Aziz v. Trump , 231 F.Supp.3d 23 (E.D. Va. 2017).
As an initial matter, the States overplay the effect of Massachusetts v. EPA on a state's ability to sue the federal government as parens patriae . There, Massachusetts was "entitled to special solicitude" because of its "stake in protecting its quasi-sovereign interests." 549 U.S. at 520, 127 S.Ct. 1438. This "stake," however, was rooted in a congressionally-created "procedural right to challenge the rejection of [the federal government's] rulemaking petition .... Id. The Court did not state this was parens patriae standing. Tellingly, the Court also recognized standing based on the state's proprietary interests, noting that Massachusetts "actually owns a great deal of the territory alleged to be affected." 549 U.S. at 498, 127 S.Ct. 1438. The Court did not suggest it was working a sea change in parens patriae standing, nor did it overrule its prior precedents of Mellon and Snapp .
The D.C. Circuit has interpreted the quasi-sovereign interests language in Massachusetts v. EPA narrowly, emphasizing that the Supreme Court's holding "turned on the unique circumstances of that case," and that the Court "made an effort to note that its finding was based on the uniqueness of the case before it." Ctr. for Biological Diversity , 563 F.3d at 476. Recently, Judge Collyer also issued a lengthy and thoughtful opinion construing Massachusetts v. EPA . She explained, "Unless Massachusetts v. EPA dramatically changed legal doctrine, a state cannot sue the United States in the state's role as parens patriae because the United States is the superior 'parent of the country.' " Gov't of Prov. of Manitoba v. Zinke , 273 F.Supp.3d 145, 167 (D.D.C. 2017). Ultimately, she concluded that "the majority's reference to quasi-sovereign interests without further elaboration on the doctrine of parens patriae does not suggest ... that Justice Stevens intended to rely on parens patriae to grant Massachusetts standing or to *16 overturn years of case law on the doctrine." Id. at 165. This Court is inclined to agree.
But even if a parens patriae action against the federal government may sometimes be appropriate, it is not so here. Comparing the States' claims to the cases they cite illustrates this point. In Aziz , for example, Virginia sought to challenge an Executive Order that would directly restrict the "benefits afforded to Virginia residents by the Immigration and Naturalization Act and the federal constitution." 231 F.Supp.3d at 32. The district court held that when an "executive action is inconsistent with a federal statute," a state may mount a parens patriae challenge "to vindicate the congressional will by preventing ... a violation of that statute by the administrative agency charged with its enforcement." Id. at 31. Virginia, in other words, had standing to enforce federal law against contrary executive action.
Here, by contrast, the States point to no federal statute or source of Congressional intent with which the Department's conduct is inconsistent. They characterize the Department's ongoing debt collection efforts as "unlawful." Am. Compl. 29. They contend that the Department certified as legally enforceable student loan debts that it "knew or should have known ... were not legally enforceable or owed." Id. at 30. Reporting to the Treasury that these debts are legally enforceable is thus "arbitrary and capricious" in violation of the APA. Id. In support of this claim, the States identify fourteen examples of "involuntary debt collection activity instituted by the Department against borrowers" who either "have not submitted individually-signed defenses to repayment," or who submitted such defenses after the debt collection activity had already occurred. Id. at 27.
But federal law does not prohibit debt collection merely because the borrower may have an as yet unasserted defense against repayment. Indeed, the law embodying Congressional intent appears to require the Department to continue its attempts to collect such debt. See 31 U.S.C. § 3711(a)(1) ; 31 U.S.C. § 3716(c)(6)(A). Thus, the executive action being challenged here fits squarely within federal law. The States, not the Defendants, are resisting the statutory scheme.
In fact, before a student borrower asserts a defense against repayment of her loans, the Department cannot know whether the individual debt will cease to be legally enforceable under federal law. As the Defendants explain, "the determination of whether a particular borrower is entitled to a discharge on the basis of a defense to repayment is delegated by regulation to the Secretary, and is necessarily based on the Secretary's discretionary assessment of whether the given borrower has demonstrated that s/he personally was harmed by conduct that would give rise to a cause of action under state law." Defs.' Reply at 17. Former Corinthian students from states requiring a showing of reliance, for example, may not be eligible for debt relief unless and until they certify that they enrolled in a Corinthian school because of a misrepresentation about the school's job placement rates.
More broadly, both the States and the federal government-through the Department-share the same quasi-sovereign interest in the "economic well-being of [their] citizens who were defrauded by Corinthian." Pls.' Mem. at 18. Exemplifying this fact, the Department, like the States, investigated Corinthian and took steps to alleviate the harm that the company's fraudulent conduct caused. The Department "responded with emergency measures to provide ad hoc relief to affected *17 borrowers, simplifying the process to apply for a borrower defense to repayment and providing loan relief to borrowers who were able to establish that they relied on these misrepresentations." Defs.' Mem. at 1. Where both the States and the federal government share a quasi-sovereign interest, "the federal interest will generally predominate and bar any [parens patriae ] action." Kleppe , 533 F.2d at 677. Thus, the States have failed to establish standing based on harm to their quasi-sovereign interests.
C.
Finally, the States fail to show that they "have standing because Defendants' unlawful collection activities have harmed their proprietary interests." They argue that the Department's debt collection activities "cause the States to pay increased government benefits," as, but for this conduct, "individuals would have additional assets and thus be ineligible for state government benefits." Pls.' Mem. at 21. They also contend that "students negatively affected by Defendants' conduct are left unable to attend the States' community colleges and universities." Id. at 23. This results in a "loss of tuition" that, along with the increase in government benefit payments, purportedly constitutes a "non-trivial economic injur[y]" establishing standing. Id.
These alleged injuries are not sufficiently concrete and particularized. Clapper , 568 U.S. at 409, 133 S.Ct. 1138. An increase in the payment of government benefits, like a decrease in tax revenues, "embodies a comprehensible harm to the economic interests of the [States'] government[s]." Kleppe , 533 F.2d 668, 672. But "this is the sort of generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable for purposes of standing." Id.
The government benefits a state pays to its citizens each year typically depend on a plethora of factors like the recipient's income, employment status, number of dependents, and net worth. For instance, to qualify for the Massachusetts Supplemental Nutrition Assistance Program, a recipient must have "a current bank balance (savings and checking combined) under $2,001," or must have "a current bank balance (savings and checking combined) under $3,001" if living with a person over the age of sixty or a person with a disability. See Massachusetts Supplemental Nutrition Assistance Program, https://www.benefits.gov/benefits/benefit-details/1280 (last visited October 9, 2018). The Program also requires individuals to have annual incomes below certain thresholds that vary based on household size. Id. The States allege no facts about the particular government programs that may have been impacted, the size of such impact, or the portion of such impact attributable to the Department.
Similarly, the allegations concerning a decrease in tuition revenues are too generalized to accord the States standing. Courts are "particularly disinclined 'to endorse standing theories that rest on speculation about the decisions of independent actors." Cierco v. Mnuchin , 857 F.3d 407, 418 (D.C. Cir. 2017) (quoting Clapper , 568 U.S. at 414, 133 S.Ct. 1138 ). This is because standing is "substantially more difficult to establish" when it is dependent on "the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." Id.
Here, the States have not established that, but for the Department's conduct, the former Corinthian students would elect to *18 enroll in the States' universities and community colleges. Some students may have already completed their studies and may not desire a return to academia after their negative experiences with Corinthian. Others may elect to attend private institutions or the colleges of other states. Simply put, the States have not offered more than a conclusory statement that the Department's debt collection "takes from these individuals the very funds they would use to continue their education." Pls.' Mem. at 23.
In short, the States' theories of harm-to their sovereign, quasi-sovereign, and proprietary interests-fail to sufficiently establish their standing to bring this suit against the Department. Because the States do not have standing, the Court must conclude that it lacks subject matter jurisdiction over their APA claim. And, without jurisdiction, "the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle , 74 U.S. 506, 514, 7 Wall. 506, 19 L.Ed. 264 (1868).[3] Accordingly, the Court will dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1).
IV.
For these reasons, the Defendants' Motion to Dismiss will be granted. A separate order will issue.

Parens patriae , literally meaning "parent of the country," is a prerogative "inherent in the supreme power of every State" that is "often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves." Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez , 458 U.S. 592, 600, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982).

The relevant federal statute here, the Higher Education Act, does not mention state law in creating borrower defenses to debt repayment. It merely establishes the Department's authority to specify the acts and omissions by a school that can give rise to a valid defense. See 20 U.S.C. § 1087e(h). But the Department's promulgated borrower defense regulations do incorporate state law. See 34 C.F.R. § 685.206(c)(1). Thus, unlike in Nuesse , it is not clear that Congress "has for various policy reasons decided to adopt and incorporate state law" into the relevant provisions of the Act. 385 F.2d at 700. Because the Department's conduct does not restrict the States' ability to enforce their laws, the Court need not determine whether "Congress has expressly contemplated that [the] States may be heard to complain of injury inflicted by the [Department's regulations]." Alaska v. Dep't of Transp. , 868 F.2d 441, 444 (D.C. Cir. 1989).

The Court therefore does not consider the Defendants' alternative arguments for dismissal under Rule 12(b)(6).